**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JIGAR V. ZAVERI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 10944 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| NORTHWEST COMMUNITY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jigar V. Zaveri, brought this action against Northwest Community Hospital ("NCH") for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Zaveri alleges that NCH discriminated against him and terminated his employment based on his race, color, national origin, religion, and sex. For the reasons explained below, the Court grants NCH's motion for summary judgment.

## MATERIAL FACTS

The following facts are undisputed except where noted. Plaintiff is male, brown-skinned, and of Indian descent, and his religion is Hindu. (ECF No. 43, Pl.'s Resp. Def.'s Stmt. Facts ¶ 1.) In addition to English, plaintiff speaks Gujarati and Hindi. (ECF No. 35, Def.'s App., Tab B, Dep. of Jigar V. Zaveri 11.) When plaintiff began his employment with NCH in April 1999, he went through employee orientation, which included a review of NCH's human-resources policies. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 5.) Plaintiff understood that he was required to comply with those policies. (*Id.*)

After spending his first two years at NCH in other positions, plaintiff transferred in March 2001 to a Pharmacy Technician position in NCH's Pharmacy Department. (*Id.* ¶ 6.)

Among plaintiff's job duties in that position were filling prescriptions; having medications checked by a Pharmacist before dispensing; distributing medications on hospital floors; maintaining medications in automated dispensing cabinets; assisting the Purchasing Coordinator with unpacking and shelving products; ensuring that correct bar codes were on medications; and adhering to all of NCH's standards, policies, and procedures.  (*Id.* ¶ 7.)

Over the years, plaintiff worked under three different individuals who served as Pharmacy Director before Jason Alonzo became the Pharmacy Director in June 2013.  (*Id.* ¶ 9.) The Pharmacy Director is responsible for overseeing the entire Pharmacy, and the Pharmacy Manager reports directly to the Pharmacy Director.  (*Id.* ¶ 10.)  In March 2001, Greg Doerr was the Pharmacy Manager.  (*Id.* ¶ 9.)  Paul Zega became the Pharmacy Director in 2004 or 2005 and remained in that position until 2013.  (*Id.*)  When Zega left NCH, Darlene Weigand was the Pharmacy Manager and filled in as the Acting Pharmacy Director until Alonzo arrived.  (*Id.*) Shortly after Alonzo became Pharmacy Director in 2013, Mary Clausen became the Pharmacy Manager.  (*Id.* ¶ 11.)  After Clausen left NCH in November 2014, Michael DeFranze began to assume duties of the Pharmacy Manager position, and he took over that position full time at the end of January 2015.  (*Id.*)

Both the Pharmacy Director and the Pharmacy Manager are responsible for issuing discipline in the Pharmacy Department.  (*Id.* ¶ 12.)  During the relevant time frame, before the Pharmacy Director and/or Manager issued any discipline, they first reviewed the discipline with NCH's Human Resources Department.  (*Id.* ¶ 13.)  Generally, they consulted Robert Mueller, who was the Employee Relations Manager; on occasion, they also discussed performance and disciplinary issues with Ann Erickson, who was then the Director of Human Resources, and Ann Patrick, Vice President of Human Resources.  (*Id.*)

At all relevant times, the Pharmacy Director and/or Pharmacy Manager issued performance evaluations to Pharmacy employees. (*Id.* ¶ 14.) In March 2013, Weigand gave plaintiff his 2012 performance evaluation, in which his overall performance rating was "Inconsistent Performer" (out of four categories: "Exceptional Performer," "Strong Performer," "Inconsistent Performer," and "Under Performer"). (*Id.*; Zaveri Dep., Ex. 14, at 2.) In March 2014, Alonzo gave plaintiff his 2013 performance evaluation, in which his overall performance rating was "Strong Performer," with inconsistent performance in certain categories, including "completes assignments in a high quality, timely and cost-efficient manner." (Pl.'s Resp. Def.'s Stmt. Facts ¶ 31; Zaveri Dep., Ex. 15, at 2.)

### NCH's Employee-Discipline Policies

At all relevant times, NCH had a written Corrective Action Policy, Human Resources Policy Number 304, which provided guidelines for "coaching" and administering corrective action. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 21.) Under this policy, depending on the situation, discipline was typically documented in a "Coaching Note" or "Coaching Report," and could progress through the following steps: Coaching, First Written Warning, Final Written Warning, Suspension, and Termination. (*Id.*) It was not necessary to undertake every step in that process, however, because the level of discipline issued to an employee depended on the severity of the incident. (*Id.*) The policy further provided that, for all Coaching and Corrective Action steps except Verbal Coaching, the employee would be requested to sign a Coaching Report to acknowledge receipt of its content. (ECF No. 52, Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 2.) The employee's signature did not indicate agreement with the content of the report. (*Id.*) Under the policy, if the employee declined to sign the report, the manager "should" document that decision on the form, and "[w]hen possible," another manager should "witness this action" and sign the

form as a witness. (*Id.*) Furthermore, all written coaching documents were to be signed and dated by the manager, and the report would become a permanent part of the employee's Human Resources file, with a copy given to the employee. (*Id.*)

At all relevant times, NCH had a written Employee Rules and Regulations Policy, Human Resources Policy Number 317, which provided expectations for employee conduct to be used as a guide for issuing corrective action. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 22.) This policy listed a number of infractions that were considered serious enough to warrant immediate dismissal, including "[i]nsubordination and/or refusal to comply with instructions or failure to perform reasonable duties as assigned." (*Id.*)

### Plaintiff's Discipline in 2014

On October 7, 2014, Clausen issued an "Employee Coaching Report" for plaintiff that documented "[s]everal incidents of inconsistent work performance" in August and September 2014. (*Id.* ¶ 35; Zaveri Dep., Ex. 17.) The incidents were (1) on August 29, when plaintiff covered purchasing responsibilities, he failed to unpack two totes of medications after having verbally confirmed that all required duties had been completed for the day, and he failed to follow recordkeeping procedures as to received medications; (2) on the same day, plaintiff did not appropriately verify inventory counts; (3) on September 12, plaintiff failed to load influenza vaccine in a dispensing machine despite having had reminders; (4) on September 13-15, plaintiff failed to refill several dispensing machines with certain tablets; and (5) there had been reports that plaintiff had "excessive personal phone calls in the IV room." (Zaveri Dep., Ex. 17.)

The Employee Coaching Report was not signed by plaintiff, and he says that he never received it and did not become aware of it until February 2015. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 35; Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 1.) Plaintiff admits the following: he met with

Clausen on October 7, 2014 about some of the incidents mentioned in the report, including the problems with the tablets and the phone calls; it is possible that he did not appropriately verify inventory counts; Clausen told plaintiff that she was going to "write him up"; plaintiff later spoke with Alonzo about some of the issues plaintiff and Clausen had discussed; and the report was contained in plaintiff's personnel file, a copy of which plaintiff obtained shortly after his employment was terminated. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 37; Zaveri Dep. 102-112.) The report is signed by Alonzo on the "witness" line, although Alonzo informed Human Resources that he was not in fact a witness to plaintiff's meeting with Clausen. (Zaveri Dep., Ex. 17; ECF No. 35, Def.'s App., Tab C, Dep. of Jason Alonzo 161.) Alonzo says that he signed the Employee Coaching Report to indicate he was "upholding" it after (1) providing reports to Clausen that indicated plaintiff had not performed his job duties; (2) Clausen told him that plaintiff had refused to sign the coaching report; and (3) Alonzo had a follow-up conversation with plaintiff about it when plaintiff complained that the discipline was unfair. (Zaveri Dep., Ex. 17; Alonzo Dep. 161-66.).

### NCH's Language Policy and Plaintiff's Discipline in 2015

NCH's written Human Resources Policy Number 305, titled Customer Service Standards, contains a subsection titled "Language" (the "Language Policy"), which provides as follows:

- Languages spoken and communication utilized should support "getting the job done."
- In work situations, English will be spoken unless the individuals present have requested or consented to speaking another language.
- In non-work situations, employees are welcome to converse in English or languages other than English, but are encouraged to be respectful and to acknowledge the presence of others who may or may not speak their language.

(Pl.'s Resp. Def.'s Stmt. Facts ¶ 16; Zaveri Dep., Ex. 12, at 3.)  The primary purposes of this policy are safety and patient care, and secondary purposes are maintaining consistent standards and communication.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 17.)

In January 2012, Pharmacy Director Zega sent a reminder email to Pharmacy staff, including plaintiff, that addressed "[t]wo issues that we have talked about many, many times in the past, but continue to be a problem."  (Zaveri Dep., Ex. 13, at 2.)  One of those issues was that "[employees continue to speak in languages other than English in the work areas."  (*Id.*)  Zega recited the Language Policy, explained that the Pharmacy's practice was that languages other than English should be spoken only in the lunchroom and during break time, and stated that the failure to follow the Language Policy would result in discipline.  (*Id.*)

When Alonzo became the Pharmacy Director in June 2013, one of the issues he knew he needed to address was that the Pharmacy historically had issues with employees speaking in languages other than English.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 38.)  Alonzo verbally reminded plaintiff multiple times that English was to be spoken while working in the Pharmacy and that use of other languages should occur only when an employee was on break or at lunch.  (*Id.* ¶ 20.)  Plaintiff says that during one of those conversations, which occurred some time in 2014 between Thankgiving and Christmas, Alonzo told him: "Don't be following the group.  If you want to be a leader, you can be a leader.  Don't be gossiping with those Indian people.  Not following them [sic]."  (Zaveri Dep. 59-61; ECF No. 45-7, Pl.'s Ex. 6, Zaveri Dep. 247-48.)  Plaintiff further stated: "He said not to following [sic] with those Indian people. . . . Then he said, 'You don't get your money in rupees, you get your money in dollars, so you have to work as a U.S. [sic].'"  (*Id.* 60.)  Alonzo says that he told plaintiff not to "follow the crowd" when others were speaking a foreign language, but denies making the statement about rupees and dollars and denies that he

6

referred to the group as "Indian people."  (ECF No. 53, Def.'s App., Tab C-1, Alonzo Dep. 116-19.)

On January 31, 2015, Pharmacy Supervisor Kate Koentz sent Alonzo and DeFranze an email stating that that day, three Pharmacy employees, including plaintiff, had spoken a foreign language in the Pharmacy during non-break times and that these events had made her uncomfortable.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 39.)  Koentz subsequently explained to Alonzo and DeFranze that plaintiff and fellow employee Maulik Shah had spoken in a foreign language in the back of the Pharmacy for about a minute, and they had not sought her consent.  (*Id.* ¶ 40.)  Plaintiff admits that Zega and Alonzo had previously told him to speak English in the Pharmacy; he and Shah had spoken in Gujarati for a minute or two in the IV room near the Pharmacy's back door; and Koentz was not next to him but probably heard him.  (*Id.*)

Alonzo and DeFranze decided to discipline plaintiff for this incident, and Mueller reviewed their decision.  (*Id.* ¶ 41.)  On February 5, 2015, Alonzo and DeFranze met with plaintiff and gave him a Coaching Report indicating that he was receiving a Final Written Warning for speaking a foreign language in violation of NCH policy.  (*Id.* ¶ 42.)  The report, which was prepared by DeFranze, stated that it was reported to management that plaintiff had again used a foreign language when speaking with a coworker, despite Alonzo's having coached plaintiff on several occasions not to use a foreign language while working.  (ECF No. 37, Zaveri Dep., Ex. 33; ECF No. 35, Def.'s App., Tab D, Dep. of Michael DeFranze 78.)  The discipline was issued as a Final Written Warning because Clausen had previously issued a Written Warning to plaintiff in 2014 (which plaintiff disputes having received) and had previously been told by Alonzo to speak English.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 41.)  Plaintiff refused to sign the report.  (*Id.* ¶ 42.)  The other two coworkers about whom Koentz had complained also

received Coaching Reports in February 2015.  (*Id.* ¶¶ 44-45.)  Shah received a Written Warning due to his other recent performance-related issues.  (*Id.* ¶ 44.)  The other coworker, who had reportedly used a foreign language while on the telephone, received a Written Coaching because there were no prior reports of his having spoken a foreign language while working.  (*Id.* ¶ 45.)

***Plaintiff's Assumption of Buyer Duties on an***
***Interim Basis, and the Termination of Plaintiff's Employment***

Yogesh Patel was NCH's longtime Purchasing Coordinator (commonly referred to as "Pharmacy Buyer" or "Buyer") until he resigned in October 2014.  (*Id.* ¶ 29.)  The Pharmacy Buyer was responsible for ordering and procuring medications from wholesalers and performing some accounting work with invoices to ensure payment.  (*Id.*)  Prior to Patel's departure from NCH, plaintiff had filled in for Patel and performed purchasing duties when Patel was on vacation.  (*Id.* ¶ 30.)  Plaintiff had been provided with some buyer training, but disputes that he was "fully" trained in buying, and states that he was never trained with respect to "consignment products."  (*Id.*)  Plaintiff knew how to place orders with vendors and was familiar with the Pharmacy's inventory-ordering system.  (*Id.*)  As part of plaintiff's 2013 performance evaluation, Alonzo stated in the evaluation that an "expected outcome and goal" for 2014 was for plaintiff to "continue buyer training," by which Alonzo meant that plaintiff should learn aspects of the Buyer role that he had not generally handled when Patel was on vacation, such as interdepartmental billing, coding, and accounting of invoices.  (*Id.* ¶ 31; Zaveri Dep., Ex. 15, at 3.)  As part of the 2013 evaluation, plaintiff submitted a self-evaluation form in which he stated that he could work "everyplace" in the Pharmacy, including purchasing, and that he had made himself familiar with the inventory-ordering system such that he could place orders through various drug wholesalers, including Cardinal Health ("Cardinal").  (Pl.'s Resp. Def.'s Stmt.

Facts ¶ 32; Zaveri Dep., Ex. 15, at 7.)  At that time, the only products NCH purchased through Cardinal were consignment pharmaceutical products (and NCH received consignment products only from Cardinal).  (Pl.'s Resp. Def.'s Stmt. Facts ¶¶ 32, 48.)  NCH paid for consignment products only if it used them or failed to timely return "short-dated" items.  (*Id.* ¶ 48.)

When Patel resigned, Alonzo asked plaintiff to perform the Pharmacy Buyer's duties on an interim basis until a replacement was found.  (*Id.* ¶ 34.)  Plaintiff agreed to perform those duties (in addition to his full-time duties as a Pharmacy Technician), and then placed drug orders, kept track of drugs and inventory, filed invoices, and communicated with Pharmacy management about orders and narcotics needing approval.  (*Id.*; Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 15.)

On October 21, 2014, plaintiff received an email from Kelly Ingle, a consignment consultant at Cardinal with whom plaintiff had been working.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 49; Zaveri Dep., Ex. 20.)  In the email, Ingle listed certain short-dated medications that NCH had in its possession, requested the return of those items to Cardinal shortly after NCH's expected receipt of packaging materials to use for the returns, and indicated that those packaging materials would be delivered by the following day.  (Zaveri Dep., Ex. 20.)  Plaintiff understood that the items needed to be returned, but he failed to do so.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 49.)

On November 4, 2014, plaintiff received an email from Norine Murray, another Cardinal employee with whom he had been working, forwarding an email from another Cardinal employee that contained a list of the same short-dated consignment products previously identified in Ingle's email.  (*Id.* ¶ 50.)  Murray asked plaintiff to complete the attached consignment reconciliation form, which would inform Cardinal which items had been used and which items NCH still had in its inventory.  (Zaveri Dep., Ex. 21, at 2.)  She also stated that

Cardinal would invoice NCH if the items had been used, and if they had not been used, they had to be returned or NCH would be billed for them. (*Id.*) Murray requested that plaintiff send the reconciliation that day, and that otherwise, Cardinal would assume that the products were still in NCH's possession and would invoice NCH's account. (*Id.*) Plaintiff sent Murray the reconciliation form three days later, with an apology for sending it late. (*Id.* at 1.) He did not, however, return the items at issue, even though he understood that they needed to be returned to Cardinal. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 50.)

On December 11, 2014, plaintiff received an email from Ingle in which she listed certain short-dated items (different from the items requested in the October and November emails) of a product called Feiba. Ingle requested that the items be returned to Cardinal shortly after NCH received packaging materials to use for the returns, and she indicated that those packaging materials would be delivered within the following week. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 51; Zaveri Dep., Ex. 22.) Plaintiff understood that the items needed to be returned, but he failed to do so. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 51.)

In early January 2015, Alonzo offered the permanent position of Pharmacy Buyer to Samantha Torres, a Pharmacy Technician who had been at NCH since September 2014, had 25 years' experience in the medical field, and had previously temporarily performed purchasing duties (not of consignment products) for a former employer. (*Id.* ¶¶ 53-54; ECF No. 37, Def.'s App., Tab K, Dep. of Samantha Torres 12-13.) Torres accepted the position on January 7, 2015 and began training with plaintiff that day. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 54.) It was expected that plaintiff would train Torres for one to two weeks, and thereafter Torres would consult plaintiff with any questions. (*Id.*)

On January 8, 2015, plaintiff received an email from Ingle stating that she "wanted to follow up with" plaintiff because Cardinal had "not received the shortdated items below from the October and December return requests." (*Id.* ¶ 52; Zaveri Dep., Ex. 23.) Ingle listed all eight items at issue and stated: "In order to prevent invoicing for this product, please return the items on Monday for delivery Tuesday, 1/13/15." (Zaveri Dep., Ex. 23.) She also attached the October email. (*Id.*) Plaintiff responded to Ingle the next day, apologizing for the delay, asking her to send the materials for return shipments again, and promising to "send it [to] you asap." (Pl.'s Resp. Def.'s Stmt. Facts ¶ 52; Zaveri Dep., Ex. 24.) However, plaintiff failed to do so. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 52.)

On February 5, 2015, plaintiff received an email from Valerie Plamondon, a Cardinal employee who had been copied on various prior emails between plaintiff and Ingle. (*Id.* ¶ 55.) Plamondon's email included plaintiff's email from January 9, in which he had stated that he would return the requested products "asap," as well as Ingle's emails from January 8 and October 21. (Zaveri Dep., Ex. 25.) Plamondon stated in pertinent part:

> Good afternoon! I wanted to follow-up on the Return Authorizations Kelly reached out to you about. We have not received the consignment product and some of it is getting extremely shortdated.
>
> I've requested a cooler be shipped to you and it will arrive at your facility on **Tuesday, February 10th.** When you receive the cooler, please pay close attention to the instructions for the return shipment. . . .
>
> Our policy is to pull product back nine months prior to expiration and provide replacement stock with extended dating. As noted above, some of the consignment items are getting extremely shortdated. **Please plan to ship the product back to us on Wednesday, 2/11, for delivery on Thursday, 2/12.** If the product is not received next week we will need to invoice for it.
> . . .
> Please let me know if you have any questions or concerns.

(*Id.* at 1.) Plaintiff understood that the requested items needed to be returned to Cardinal, but failed to do so. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 55.)

On February 6, 2015, plaintiff sent Torres an email forwarding the previous day's email chain from Plamondon, which included the list of products at issue. (*Id.* ¶ 56.) Plaintiff's own email to Torres was blank; it did not contain any additional content or instruction, and plaintiff had not previously sent Torres any of the prior emails from Cardinal. (*Id.*) Torres says that she asked plaintiff about the email, and he said not to worry and that he was taking care of it. (Torres Dep. 55.) Plaintiff says that when he was training Torres during the first week of January, he told her that she had to return short-dated products to Cardinal, showed her where the products were, and gave her a list of the products at issue. (Zaveri Dep. 145-46.)

Although Cardinal continued to email plaintiff and he responded to some of those emails, plaintiff did not inform Cardinal until February 17, 2015 that Torres was the new Buyer at NCH. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 57.) Plaintiff did not inform Pharmacy management about Cardinal's multiple requests for return of the consignment products or that the items had not been returned, nor did he inform them of any lack of knowledge about how to return the products. (*Id.*)

On February 17, 2015, Plamondon sent Torres an email introducing herself and stating, among other things, that NCH had "several items currently in [its] consignment inventory which will need to be returned as soon as possible," and attaching a reconciliation spreadsheet with a list of the items, which included nearly all of the items listed in Ingle's October and December emails. (Zaveri Dep., Ex. 11.) Plamondon stated that she would have a cooler shipped to NCH and requested that the items be returned as soon as possible when the cooler arrived. (*Id.*) A

number of emails between Plamondon and Torres ensued in which Torres asked several questions to clarify which products were at issue. (*Id.*) In one of those emails, dated February 18, Torres asked about the items' expiration dates and stated: "Please correct me if I'm wrong. These items were on the list Jigar gave me. I pulled all of what we had pertaining to these lot numbers stated and like a dork did not look at the actual expiration[,] just assumed since the letter was dated a while back that by now it would have expired." (*Id.*) On February 19, Plamondon responded, stating, "I know you're just walking into this and it may be a bit confusing," yet also informing Torres that Cardinal had "previously notified [Zaveri] about the shortdated items" and that "[t]he items highlighted on the spreadsheet are extremely shortdated and we will need to invoice for them." (*Id.*) After multiple communications with Cardinal, Torres learned that she could not return the products to Cardinal; NCH or Cardinal had yet to find another purchaser for them; and Cardinal planned to bill NCH over $44,000.00 for them. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 58.)

On February 24, 2015, Torres told Pharmacy management that the consignment products had not been returned to Cardinal and that NCH was going to be billed $44,436.55 for failing to return them. (*Id.* ¶ 59.) DeFranze met with Torres, who gave him a copy of emails from Cardinal that she had received, and she told DeFranze that plaintiff had previously told her that he was going to return the product to Cardinal. (*Id.*) This was the first time Pharmacy management was made aware of the problem with the Cardinal items. (*Id.* ¶ 60.)

The same day, Alonzo sent DeFranze an email that said "[Torres] just informed me that Cardinal is invoicing us for several consignment items that we did not return in Oct. [Zaveri] was notified in October that the items needed to be returned. [Torres] is checking the inventory

now and is going to get me a $ value.  I am anticipating well over $10k[.]  I am going to ask that [Torres] confirm a few things and I want to double check what notification he gave to her in Jan. Time to take [a] risk . . . ."  (Zaveri Dep., Ex. 45.)  Alonzo testified that this statement meant that from human-resources perspective, he and others had previously "taken a very conservative path" and refrained from recommending terminations, but in this case, he felt that it was necessary to recommend the termination of plaintiff's employment.  (Alonzo Dep. 185.)

After reviewing the emails dating back to October 2014 and talking with Torres, DeFranze and Alonzo concluded that despite ample opportunity for plaintiff to have returned the products, he had failed to do so.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 61.)  They no longer trusted plaintiff to perform his assigned duties.  (Id.)  They believed that it was plaintiff, not Torres, who was responsible for returning the products to Cardinal.  (Id. ¶ 67.)  According to DeFranze, plaintiff's instances of prior discipline in October 2014 and February 2015 were contributing factors in the decision to terminate plaintiff's employment.  (Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 28.)  Both Alonzo and DeFranze testified, however, that plaintiff's lack of action with respect to the Cardinal products was serious enough to warrant termination on its own.  (Alonzo Dep. 213; DeFranze Dep. 135.)

DeFranze and Alonzo prepared a Recommendation to Terminate Employment ("Recommendation") and a Coaching Report that described plaintiff's failure to return consignment products to Cardinal, and they sent the form to Mueller, along with some of the Cardinal emails.  (Pl.'s Resp. Def.'s Stmt. Facts ¶ 62.)  The Recommendation described the details of Cardinal's repeated requests and plaintiff's failure to return the products.  (Zaveri Dep., Ex. 46.)  The Coaching Report also contained those details, along with the "additional

background information" that plaintiff had received the Written Warning from Clausen for work performance and the Final Written Warning for speaking a foreign language during work in the Pharmacy. (*Id.*, Ex. 47.)

Alonzo discussed the matter with his then-supervisor, Melissa Smith, an NCH vice president. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 62.) Mueller reviewed the Recommendation and Coaching Report, and he and Erickson shared the information with Patrick. (*Id.* ¶ 63.) Erickson and Mueller were familiar with plaintiff's employment history and discipline, including the October 2014 Written Warning and the February 2015 Final Written Warning, and they reviewed this information with Patrick. (*Id.*) While the decision to terminate plaintiff's employment was made collaboratively by Smith, Patrick, Erickson, Mueller, and Alonzo, the final decision to terminate was made by Patrick, along with Erickson (according to DeFranze) or Smith (according to Mueller). (*Id.* ¶ 64; Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 27.)

On March 6, 2015, DeFranze and Alonzo met with plaintiff and informed him that his employment was being terminated, and they gave him a copy of the Coaching Report that described the emails plaintiff received from Cardinal and plaintiff's failure to return the consignment products. (Pl.'s Resp. Def.'s Stmt. Facts ¶ 65.) They also informed plaintiff that NCH was going to be billed for the products. (*Id.*) While plaintiff did not deny that he had received the emails from Cardinal requesting him to return the consignment products, he refused to sign the Coaching Report. (*Id.* ¶ 66.)

On March 12, 2015, Torres was notified that a buyer had been found for some of the short-dated products from Cardinal. (Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 31.) Ultimately, Cardinal billed, and NCH paid, $16,672.00 for fourteen vials of Humate-P, which was one of the

products at issue.  (*Id.*)  Of those fourteen vials, ten were destroyed and four were "unaccounted for," meaning that Alonzo could not say for sure whether they had been sold to patients.  (*Id.* ¶ 32.)

This lawsuit ensued.

## DISCUSSION

A.      **Legal Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014).  A factual dispute is "genuine" only if a reasonable jury could find for either party.  *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014).  Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case.  *Id.*  Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* (internal quotation marks and citation omitted).  The nonmovant need not produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in his favor.  *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

**B.     Title VII and Section 1981**

Plaintiff claims that NCH discriminated against him on the basis of his race, color, national origin, religion, and sex in violation of Title VII and § 1981 by disciplining him and terminating his employment.  The Court analyzes Title VII and § 1981 claims under the same framework.  *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016).  The Court no longer sorts evidence of purported discrimination into "direct" and "indirect" categories.  *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017).  The applicable standard at summary judgment is simply whether the evidence would permit a reasonable factfinder to conclude that one of the plaintiff's protected characteristics caused the adverse employment actions at issue.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  "In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547-48 (7th Cir. 2017).

NCH submits significant and largely undisputed evidence of plaintiff's poor job performance during the last six months of his employment.  First and foremost, plaintiff failed to return Cardinal's short-dated consignment products after having been asked to do it several times.  The record clearly establishes that this was a legitimate reason for terminating plaintiff's employment.  According to NCH's policy, an employee's failure to perform reasonable duties as assigned was considered serious enough to warrant termination.  Plaintiff admits that although he understood that the products needed to be returned to Cardinal after it so requested, he failed to return them despite repeated emails over a period of several months.  Then and now, plaintiff offers no excuse for this failure, but argues generally that he was not "fully trained" for his

duties as interim Buyer.  (ECF No. 45, Pl.'s Resp. Def.'s Mem. at 12.)  The evidence is that plaintiff agreed to assume those duties and had previously touted his ability to perform them. Moreover, he points to no particular deficiency in his training that rendered him unable to respond to Cardinal's requests and return the products according to Cardinal's detailed instructions.  Plaintiff emphasizes that of the $44,436.55 liability as initially calculated, NCH ended up paying Cardinal $16,672.00 for fourteen vials of Humate-P, and plaintiff speculates that four of those vials "could have been used and paid for by a patient." (*Id.* at 14.)  But what NCH ultimately paid is somewhat beside the point, which is that plaintiff's inaction caused the *risk* that NCH would incur a liability of tens of thousands of dollars.  In any event, $16,672.00 is nothing to shrug at.

In addition to plaintiff's failure to return the Cardinal products, NCH also considered that plaintiff had received a Written Warning in October 2014 for not just one, but several performance issues, and then received a Final Written Warning in February 2015 for (admittedly) speaking in a foreign language while working in the Pharmacy.  Plaintiff faults NCH for failing to follow the letter of its Corrective Action Policy when issuing this discipline. Specifically, he notes that Clausen did not document in the October 2014 warning that plaintiff had refused to sign it; Alonzo signed the form as a witness despite not having been present; and plaintiff was not given a copy.  Plaintiff also notes that the February 2015 warning does not list the October warning in the section of the form marked "Summary Of Coaching/Interventions/Related Training In The Previous 12 Months."  It is true that "significant, unexplained or systematic deviations" from established policies can sometimes be probative of unlawful discriminatory intent.  *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 907 (7th

Cir. 2015) (brackets and internal quotation marks omitted). But here, as in *Smith*, plaintiff has not explained why these minor deviations in the disciplinary process support an inference of discriminatory intent, nor does the Court see any basis for such an inference. Plaintiff admits that he met with Clausen and discussed at least some of the problems addressed in the October warning and that it is possible that he did not appropriately verify inventory counts, one of the items of discipline. He does not contend that Clausen harbored any discriminatory intent. Alonzo explained that he signed the report on the witness line to indicate approval after plaintiff complained to him that the discipline was unfair and Clausen informed him that plaintiff had refused to sign it. As for the February warning, DeFranze stated that when he was preparing it, he was aware of plaintiff's previous discipline in October 2014, which is why the warning was issued as a "Final" Written Warning, and he neglected to mention the previous discipline as an oversight due to only recently having assumed the Pharmacy Manager position. (DeFranze Dep. 81-85, 116.)

Plaintiff maintains that the February 2015 discipline was issued as a result of NCH's "over-enforcement" of its Language Policy "in a manner that eliminated the possibility of consent." (Pl.'s Resp. Def.'s Mem. at 11.) Plaintiff states that he is not arguing that the Language Policy itself is unlawful, but that NCH enforced it "in a manner that is more severe than its plain language." (*Id.* at 10.) He cites other employees' varying beliefs about the terms of the Language Policy; some believed that the policy was a strict prohibition on speaking in a foreign language. But these employees' beliefs are not relevant to the January 2015 incident for which plaintiff was disciplined, which did not involve any dispute about consent. Plaintiff admittedly spoke a foreign language while working in the Pharmacy, and there is no evidence

that his fellow employee Koentz consented to his doing so or that he and/or Shah sought Koentz's consent. The Court does not sit as a "super-personnel department with authority to review an employer's business decision" on whether an employee should be disciplined because of a work-rule violation. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). The record contains no evidence from which it could be concluded that NCH did not honestly believe the stated reasons for disciplining plaintiff for violating the Language Policy.

Plaintiff points to three other factors from which, he argues, a reasonable jury could conclude that NCH discriminated against him based on his race, color, national origin, religion, and sex. One is that, in plaintiff's view, Alonzo and DeFranze "withheld crucial facts" from human-resources personnel when communicating with them about the grounds for the termination of plaintiff's employment. Plaintiff points out that Alonzo did not state in the March 2015 Coaching Report that plaintiff had forwarded Cardinal's February 5, 2015 email to Torres, and neither the Recommendation to Terminate nor the Coaching Report mention that, according to plaintiff, plaintiff had informed Torres that the consignment products needed to be returned. Plaintiff also cites the deposition testimony of Mueller, Smith, Erickson, and Patrick, in which some testified that they either did not see or did not recall having seen the February 17-19 email chain between Cardinal personnel and Torres, as well as Mueller's testimony that he had not seen the February 24, 2015 email from Alonzo to DeFranze in which Alonzo stated that it was "time to take [a] risk." Plaintiff does not explain why these communication or documentation gaps, assuming they can be so described, can be characterized as "crucial." By the time the February emails were sent, plaintiff had already failed to act upon months of emails from Cardinal. The email of February 5, which was forwarded without explanation or other comment,

did not indicate that plaintiff gave Torres any context for the email thread or information about the situation with Cardinal. And, like plaintiff's arguments about the disciplinary process, plaintiff does not explain why these circumstances support any inference that the real reason for plaintiff's termination was discriminatory.

Plaintiff also asserts that a reasonable jury could find unlawful discrimination because Samantha Torres was similarly situated to him and treated more favorably. Plaintiff argues that Torres "also failed to comply with multiple requests to return the consignment product but was not disciplined." (Pl.'s Resp. Def.'s Mem. at 13.) No reasonable juror, however, could find that plaintiff and Torres were similarly situated. "The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks and citation omitted). Similarly-situated employees need not be identical to plaintiff in "every conceivable way," but they must be "directly comparable" to him in "all material respects." *Id.* A plaintiff must usually show, among other things, that he and the comparator engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* Plaintiff cannot make this showing. First, he had more experience with purchasing than did Torres, who did not have previous experience purchasing for NCH or with consignment products. Plaintiff, on the other hand, had previously performed purchasing duties on an interim basis when Yogesh Patel was on vacation, in addition to plaintiff's stint in late 2014 and early 2015. Second, by the time Torres assumed the Buyer position, plaintiff had already received several emails from Cardinal requesting return of the products. Torres had just begun the job a day or two prior to plaintiff's receipt of the third email from Cardinal in early January 2015 and

plaintiff's promise to Cardinal to return the products "asap." Although plaintiff says that around that time, he gave Torres a list of the products that had to be returned and showed her where the products were, plaintiff does not point to any evidence that he fully explained the situation or the urgency of the need for action. Moreover, at that point Torres herself had not received any emails from Cardinal, nor did she until February 6, when plaintiff forwarded her the email chain from Plamondon without comment. The Court agrees with NCH that any alleged failure by Torres to return the consignment products during the first month of her job as Buyer without having had communications from Cardinal is not comparable to plaintiff's having failed to return the products after months of Cardinal's requests.

Finally, plaintiff also relies on Alonzo's alleged admonishment about not gossiping with or following "Indian people" and being paid in dollars and not rupees.[1] Assuming the truth of plaintiff's testimony that the remarks were made (as this Court must do for purposes of defendant's motion), and further assuming that they reflect animus based on race, color, or national origin, as opposed to reflecting facts related to Alonzo's instructing plaintiff to speak in English and not Gujarati in the Pharmacy pursuant to NCH's Language Policy, there is no evidence to suggest that the comments were related to the decision to terminate plaintiff's employment. They occurred three months prior to the termination, and the intervening events were plaintiff's Final Written Warning for speaking Gujarati in the Pharmacy (arising from a complaint by Koentz, who is not alleged to have any discriminatory motive) and the discovery (arising from Torres having informed Alonzo) that plaintiff had failed to respond to Cardinal's

---

[1]Although plaintiff mentions Alonzo's "time to take [a] risk" email three times in his brief, he does not present any legal argument about the statement.

repeated requests, thereby risking not-insignificant financial liability to NCH. In addition, plaintiff does not dispute that the ultimate decision to terminate his employment was made by Patrick along with either Erickson or Smith, and plaintiff does not assert that any of those individuals harbored a discriminatory animus toward him. Alonzo's comments are "too thin a reed" to support the weight of plaintiff's claims. *See Ballard v. Ill. Cent. R.R.*, 269 F. Supp. 3d 867, 875 (N.D. Ill. 2017).

Against the backdrop of overwhelming and largely undisputed evidence of plaintiff's poor job performance, the evidence on which plaintiff relies, taken together, is insufficient to support a jury verdict of intentional discrimination based on any of plaintiff's protected characteristics. Throughout his brief, plaintiff refers to Alonzo and DeFranze collectively as "Pharmacy Management," seemingly in an effort to link Alonzo's comments with the minor communication and documentation gaps in the disciplinary process and create a suggestion of pretext for the discipline and termination. But even interpreting the facts in the light most favorable to plaintiff, the record does not support an inference of discriminatory motive. The ultimate question is simply whether the same events would have transpired if plaintiff had not been male, brown-skinned, Hindu, and of Indian descent and everything else had been the same. *See Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 724 (7th Cir. 2018). The only reasonable answer is yes. Considering all of the evidence as a whole, the Court concludes that a reasonable factfinder would not be entitled to conclude that impermissible discrimination caused the discipline and termination.

Plaintiff also contends that he can defeat NCH's summary-judgment motion under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that

framework, plaintiff has the initial burden of showing that "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Ferrill*, 860 F.3d at 500. "If the plaintiff makes this prima facie showing, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.*

Plaintiff does not meet his initial burden under the *McDonnell Douglas* framework. As discussed above, plaintiff cannot demonstrate that he was meeting NCH's legitimate expectations. He ignored Cardinal's multiple requests for return of products and offered no excuse for his lack of action. He also admitted to conduct that violated NCH's Language Policy, and he was previously disciplined for performance issues. It is possible that the *McDonnell Douglas* test could be applied in a "flexible" way, as in *Ismail v. Brennan*, 654 F. App'x 240, 243 (7th Cir. 2016), such that plaintiff were not required to make a showing on the second prong of the test if plaintiff's arguments could be construed as a contention that NCH did not fairly apply its legitimate expectations to him. In that case, the question of whether plaintiff met NCH's legitimate expectations would "merge" with the question of whether similarly-situated employees were treated differently. *See Rodriguez v. Children's Home & Aid Soc'y of Ill.*, No. 16 C 5225, 2018 WL 620059, at *8 (N.D. Ill. Jan. 30, 2018); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . . , the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the

pretext inquiry."). But, for the reasons discussed above, plaintiff cannot demonstrate that he was similarly situated to Samantha Torres.

Even if the Court assumed *arguendo* that plaintiff had established a prima facie case of discrimination, NCH has offered legitimate reasons for its termination of plaintiff's employment, as discussed above: NCH discovered that plaintiff had failed to act on Cardinal's requests to return the consignment products and plaintiff had already been disciplined twice in recent months. To show that these reasons are pretextual, plaintiff must present evidence suggesting that NCH is dissembling, *i.e.*, relying on a phony excuse. *See Skiba*, 884 F.3d at 724. "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.* It is not the Court's concern that an employer may have been too hard on its employee; the only issue is whether the employer's proffered reasons are a "lie." *Id.* Plaintiff admits that he failed to send the consignment products back to Cardinal after having received requests for months, and he also admitted to using a foreign language while working in the Pharmacy, which was the basis for the February 2015 discipline. Furthermore, as discussed above, the evidence on which plaintiff relies fails to create a genuine issue that NCH's reasons for terminating his employment are unworthy of credence.

## CONCLUSION

Defendant's motion for summary judgment [32] is granted, and judgment will be entered in favor of defendant and against plaintiff. Civil case terminated.

**DATE**: May 22, 2018

**Ronald A. Guzmán**
**United States District Judge**